# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEREMY CARR, | ) | CIVIL ACTION NO.: |
| *Plaintiff*, | ) | |
| v. | ) | ECF CASE |
| NORFOLK SOUTHERN RAILWAY COMPANY, | ) | **JURY TRIAL DEMANDED** |
| *Defendant*. | ) | |

## COMPLAINT

### NATURE OF ACTION

1. The plaintiff Jeremy Carr brings this action against the defendant Norfolk Southern Railway Company for violation of the Federal Rail Safety Act, 49 U.S.C. Section 20109 (FRSA).

### JURISDICTION

2. This Court has subject matter jurisdiction in this case pursuant to the Federal Railroad Safety Act, 49 U.S.C. Section 20109(d)(3). Venue of this action in this District is proper because the defendant Norfolk Southern Railway Company maintains offices and conducts extensive operations within this District.

### PARTIES

3. The defendant Norfolk Southern Railway Company (hereinafter, "Norfolk Southern") is a railroad carrier engaged in interstate commerce. As such, it is a railroad carrier within the meaning of 49 U.S.C. 20102.

1

4.   The plaintiff Jeremy Carr is a resident of Carlisle, Pennsylvania and at all material times qualified as a Norfolk Southern employee within the meaning of the FRSA, 49 U.S.C. Section 20109.

### PLAINTIFF'S WORK AS A DISPATCHER FOR NORFOLK SOUTHERN

5. At all times referenced herein Mr. Carr was employed by Norfolk Southern as a train dispatcher working out of defendant's Movement Office in Harrisburg, Pennsylvania.

6. At Norfolk Southern, train dispatchers such as Mr. Carr are essentially the "air traffic controllers" of the railroad.  Mr. Carr and his fellow train dispatchers are charged with the coordination of train traffic on the rails.  Dispatchers' work involves countless decisions that impact the safety of railroad workers and the public riding on the rails as well as the members of the public who reside, work and travel near rail tracks.

### FRSA SECTION 20109

8. The purpose of the Federal Rail Safety Act is to "promote safety in every area of railroad operations and reduce railroad-related accidents," 49 U.S.C. §20101, and one of the ways the FRSA does so is by providing whistleblower protection to railroad workers who are engage in certain protected activity. 49 U.S.C. §20109.  Under Section 20109 of the FRSA it is protected activity for any employee to report "a hazardous safety or security condition." 49 U.S.C. §20109(b)(1)(A). Railroads are prohibited from disciplining an employee for reporting a hazardous safety condition.  Id.

9. It is a violation of the FRSA for a railroad employer to "reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's" protected activity. 49 U.S.C. §20109. The FRSA rights of employees cannot be

overridden or ignored by any railroad policy: "The rights and remedies in this section may not be waived by any agreement, policy, form, or condition of employment." 49 U.S.C §20109(h).

## FACTS

10.  During the years 2010 through 2014, Mr. Carr and his fellow dispatchers performed their jobs as dispatchers with the assistance of a computer software program that was supposed to track the movement on the rails and guide their decision-making in a manner that largely ensured safety and efficiency.

11. In the summer of 2014 Norfolk Southern was working with General Electric ("GE") to develop a new computer software program which was intended to enhance the program in place and further automate the dispatching function.  During that summer, Mr. Carr was invited by Norfolk Southern management to attend meetings at GE headquarters in Melbourne, Florida to assist on the railroad's behalf with pre-implementation of GE's software (named "Movement Planner & Auto Router") in the Harrisburg Division.

12. Mr. Carr traveled to GE's Florida offices on behalf of Norfolk Southern on three different occasions in an effort to assist GE engineers in improving Movement Planner & Auto Router.  During those trips to Florida Mr. Carr discovered that GE's software was deficient in a number of significant respects.  Even after giving his input to the GE engineers, Mr. Carr found that the software was not improving despite his best efforts and the efforts of other dispatchers who accompanied him to GE's Florida offices.

13. On or about April 2015, shortly after Norfolk Southern began using GE's Movement Planner & Auto Router, Mr. Carr along with Norfolk Southern manager, Ryan Scacco, met with GE personnel about their software program. During this meeting Mr. Carr spoke out about the numerous serious safety concerns that Norfolk Southern dispatchers had raised with him about

the software since Movement Planner & Auto Router had been implemented at Norfolk Southern. Shortly after Mr. Carr began bringing up various safety concerns, he was stifled by his supervisor Ryan Scacco who told plaintiff that he was "getting off topic" and "needed to be quiet." Mr. Scacco then prevented Mr. Carr from educating the GE engineers about how the software was creating unnecessary safety problems at public track crossings. At this point Mr. Carr was intimidated by Mr. Scacco's presence and conduct and he stopped raising safety concerns.

14. By Spring 2015 Mr. Carr and his fellow dispatchers observed and discussed with one another how the use of Movement Planner & Auto Router at Norfolk Southern was creating numerous safety issues. The software was causing significant delays to trains and therefore excessive hours of service for the train crews. This is a major safety concern as exhausted over-worked crews are more likely to make mistakes and cause accidents and injuries. The software also caused trains with hazardous materials to be stopped unnecessarily in high traffic or high population areas. The software also failed to allow for safe stopping distances between trains which increased the risk of a catastrophic collision. Finally, the automatic updates generated by the software every two minutes created further safety problems as the constant updating inhibited the dispatcher's ability to intervene when the software directed movement that a dispatcher must override.

15. At Norfolk Southern dispatchers such as Mr. Carr are required to alert their managers when they encounter a hazardous safety condition. Norfolk Southern Operating Rule J states that any defects or unusual conditions that may affect the safe and efficient operation of the railroad must be reported promptly to the proper authority by the quickest means of communication.

16. Norfolk Southern Operating Rule 630(g) is specific to the responsibilities of train dispatchers and it dictates that train dispatchers will report any violation of the Operating Rules and any irregularity relating to the movement of trains.

17. Norfolk Southern Operating Rule 4 provides that all employees must perform all duties efficiently and safely and in case of doubt or uncertainty, the safe course must be taken.

18. Norfolk Southern General Safety Rule 910 provides that employees must not do any work that will jeopardize the safety of others and they must know that the tools and facilities they are using to perform their jobs are in proper condition.

19. Throughout the Spring, Summer and Fall of 2015 Mr. Carr encountered numerous hazardous safety conditions while trying to work with Movement Planner & Auto Router. On nearly every occasion when Mr. Carr would encounter hazardous safety conditions created by the software he would report the condition by sending an email to his co-workers and Issue Tracker notifications to his Norfolk Southern supervisors. Mr. Carr also called the Norfolk Southern Safety & Compliance Hotline and reported the hazardous safety conditions created by the GE software.

20. Throughout the Spring, Summer and Fall of 2015 Mr. Carr reported to his co-workers and his supervisors at Norfolk Southern the following hazardous safety conditions created by the software:

- Failure to properly identify trains carrying hazardous materials
- Failure to provide sufficient track space for safe passing of large trains at meeting places
- Failure to provide proper signals for safe run ins or run outs of trains being moved on to siding tracks
- Failure to clear public grade crossings in a timely and safe manner
- Failure to give sufficient advance notice for safe stops
- Failure to route trains away from tracks that have not yet been deemed safe of defects created by severe weather or other conditions

- Failure to allow for quick manual override in the event of an emergency

21. During the Spring, Summer and Fall of 2015, Mr. Carr was the most vocal and persistent among the dispatchers reporting the safety hazards to Norfolk Southern managers, but from conversations with his fellow dispatchers he was aware that the others were experiencing the same hazards he was.

22. During the Spring, Summer and Fall of 2015, Mr. Carr's managers made it very clear to him that Norfolk Southern had paid a large sum of money for the GE software and as a result the railroad was committed to using the software without regard to any safety complaints.

23. During the Summer of 2015, Norfolk Southern manager Ryan Scacco told Mr. Carr that he should stop filing safety complaints about the software and Scacco falsely claimed that Mr. Carr was the only one who had concerns about the program and that he was simply raising matters of preference over actual problems. Scacco told Mr. Carr to stop filing tickets (written complaints) through Issue Tracker and that he needed to stop manually overriding Movement Planner & Auto Router even though refraining from doing so could make a hazardous situation worse. Mr. Carr was intimidated by Scacco's comments which were inconsistent with the Norfolk Southern rules that require Mr. Carr to report hazardous safety conditions. Nevertheless, Mr. Carr did his best to comply with Scacco's request regarding manual override of the software while he continued alerting Norfolk Southern management of the unsafe conditions created by Movement Planner & Auto Router.

24. By the Fall of 2015 despite Mr. Carr's many expressed safety concerns, no action was taken by Norfolk Southern to correct the problems created by the software.

25. On or about September 17, 2015, Norfolk Southern manager David Gooden said to Mr. Carr "what will it take to get you to stop calling the safety hotline about Movement Planner & Auto Router." Mr. Carr then told Gooden in detail about the problems and safety issues with

the software. Thereafter, Gooden never followed up with Mr. Carr to correct or even attempt to correct the safety issues related to the software.

26. On or about November 8, 2015, Mr. Carr reported a safety issue caused by Movement Planner & Auto Router (the software failed to identify the location of trains endangering rail crews and the public) and he also took his computer out of service because it was hampered by delay issues that created a safety hazard. Mr. Carr's decision to remove the computer from service was consistent with his obligations under Norfolk Southern Rule 1200 which requires that no employee knowingly use a tool or device known to be defective.

27. On or about November 10, 2015, Mr. Carr arrived at work and was brought into a meeting with Jonathon Sullivan, Assistant Superintendent of Dispatch, and David Gooden. (As of November 2015, Ryan Scacco had been transferred to a different position.) During this meeting Sullivan and Gooden falsely accused Mr. Carr of wishing for the failure of Movement Planner & Auto Router. Sullivan and Gooden told Mr. Carr that his emails reporting safety concerns were "unprofessional" and had to stop because they were causing senior Norfolk Southern managers to focus unwanted attention on the Harrisburg Division. Sullivan and Gooden also told Mr. Carr that the Norfolk Southern managers responsible for Movement Planner & Auto Router were angry with Mr. Carr for raising so many safety reports. Gooden then told Mr. Carr that he expected that Mr. Carr would not send any more emails or issue tickets regarding safety issues related to Movement Planner & Auto Router and that he is no longer to point out any flaws in the software. At the end of the meeting Mr. Carr was ordered to go home and told that he should come back as a "different man." Mr. Carr felt threatened and intimidated by Sullivan's and Gooden's retaliatory reaction to his safety complaints.

28. Following the meeting with Sullivan and Gooden, Mr. Carr reported the meeting to his local union representative. Thereafter, a meeting was held with Sullivan, Gooden, Mr. Carr and his union representative. At this meeting, Sullivan and Gooden falsely denied that they had ordered Mr. Carr to stop raising safety issues about the software.

29. Because Sullivan and Gooden denied that they had instructed Mr. Carr to refrain from making safety reports, and because he was obligated by Norfolk Southern Operating Rules and Safety Rules to report safety hazards, he continued to send emails pertaining to issues with Movement Planner & Auto Router.

30. On or about November 29, 2015, Mr. Carr sent an email to Sullivan highlighting a problem with the software that was potentially creating a safety issue concerning overworked crews.

31. On or about December 4, 2015, in retaliation for reporting the safety hazards, Sullivan called Mr. Carr and advised him that he was being taken out of service pending investigation into the charge that he failed to follow instruction not to send emails about Movement Planner & Auto Router. Following notification of the charges against him, Norfolk Southern held a biased internal disciplinary hearing which predictably found him guilty and Mr. Carr was suspended without pay for twenty days.

32. After Mr. Carr served the twenty day suspension he returned to work as a dispatcher in the Harrisburg Division. Since his return to work he has found that the suspension and the treatment he received from Sullivan and Gooden has intimidated him into refraining from raising safety concerns related to Movement Planner & Auto Router even though the software continues to cause safety concerns. Mr. Carr's dispatcher colleagues have also been intimidated into silence as a result of observing Norfolk Southern's retaliatory treatment against Mr. Carr.

## FRSA CAUSE OF ACTION

The plaintiff adopts by reference and realleges each and every allegation set forth in paragraphs 1 through 32 of this Complaint with the same force and effect as if set forth under this cause of action.

33. The plaintiff engaged in FRSA subsection (b)(1)(A) protected activity when he reported hazardous safety conditions created by Movement Planner & Auto Router.

34. The defendant Norfolk Southern had knowledge of all the plaintiff's protected activities referenced above. The Railroad knew or should have known that such activity was protected under FRSA subsection (b)(1)(A).

35. The defendant Norfolk Southern took adverse or unfavorable actions against the plaintiff in whole or in part due to his protected activities when they: ordered him home, subjected him to disciplinary charges and a disciplinary hearing, a twenty day unpaid suspension and subjected him to hostility and intimidation. In so doing, the defendant acted with reckless disregard for the law and with complete indifference to plaintiff's FRSA rights.

36. As a result of the defendant's conduct in violation of the FRSA, the plaintiff has suffered and will suffer various economic harms as well as emotional distress and attorney fees and costs.

37. The plaintiff filed a FRSA Complaint with the Secretary of Labor's Region III OSHA Whistleblower Office on April 19, 2016. That complaint was filed within 180 days from the date the plaintiff became aware of the defendant Railroad's intent to take the adverse or unfavorable personnel actions against him.

38. The Region III OSHA Whistleblower Office of the U.S. Department of Labor commenced its investigation and the plaintiff fully cooperated with OSHA's investigation. However, as of this date the U.S. Department of Labor has not issued a final decision, and it now has been far more than 210 days since the filing of the FRSA Complaint.

39. Accordingly, pursuant to subsection (d)(3) of the FRSA, the plaintiff has a statutory right to bring an original action in United States district court for a jury trial regarding the Railroad's violations of the FRSA. 49 U.S.C. Section 20109(d)(3).

40. Pursuant to 49 U.S.C. 20109(d)(3), the plaintiff now is bringing this original action at law and equity for de novo review by the United States District Court for the Western District of Pennsylvania, which Court has jurisdiction over this FRSA action without regard to the amount in controversy.

WHEREFORE, in order to fairly and justly compensate the plaintiff and thereby promote safe operating conditions on the defendant Norfolk Southern, and in order to encourage employees to freely report all hazardous safety conditions without fear of any adverse actions being taken against them, thereby fulfilling the purpose of the FRSA to promote safety in every area of our nation's railroad operations, the plaintiff demands a Judgment under the FRSA for all relief necessary to make him whole, including:

--expungement of any and all references to the adverse actions related to the plaintiff's protected activities described above;

--compensatory damages for any medical expenses incurred due to defendants' conduct;

--compensatory damages for any economic losses due to defendants' conduct, including lost wages incurred as a result of prosecuting this matter;

--compensatory damages for emotional distress due to defendants' conduct;

--the statutory maximum of punitive damages;

--special damages for all litigation costs including expert witness fees, attorney fees, and costs;

and any further relief the Court deems just and equitable.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial as to all claims so triable.

Date:  July 19, 2017

*s/ Deborah K. Marcuse*
Deborah K. Marcuse (PA I.D. No. 322354)
dmarcuse@fdpklaw.com
Feinstein Doyle Payne & Kravec, LLC
429 Fourth Avenue
Law and Finance Building, Suite 1300
Pittsburgh, PA 15219
Tel:  (412) 281-8400
Fax:  (412) 281-1007

*s/ Stephen J. Fitzgerald*
Stephen J. Fitzgerald, Esq. (CT I.D. No. 309128)
GARRISON, LEVIN-EPSTEIN FITZGERALD & PIRROTTI, P.C.
405 Orange Street
New Haven, CT  06511
Tel.:  (203) 777-4425
Fax:  (203) 776-3965
E-mail: sfitzgerald@garrisonlaw.com

*Attorneys for Plaintiff*